## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**RHONDA F. JONES,**

        **Plaintiff,**

        **v.**

**OHIO NATIONAL LIFE**
**INSURANCE COMPANY, et al.,**

        **Defendants.**

        **Case No. 1:20-cv-654**
        **JUDGE DOUGLAS R. COLE**

### OPINION & ORDER

This cause comes before the Court on Defendants Ohio National Life Insurance Company and Ohio National Life Assurance Corporation's (together "Ohio National") Motion to Dismiss (Doc. 9) Plaintiff Rhonda Jones's Complaint (Doc. 1). For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Ohio National's Motion to Dismiss (Doc. 9).

### BACKGROUND[1]

This Complaint stems from Plaintiff Rhonda Jones's purchase of an insurance policy she contends was unsuitable for her needs. At all times relevant to the Complaint, Jones was working as a part-time bookkeeper for her husband's small business, making approximately $54,000 per year. (Compl., Doc. 1, #4[2]). As part of Jones's investing strategy, she maintained brokerage accounts with financial advisor

---

[1] For purposes of a motion to dismiss, the Court accepts as true the factual allegations in the Complaint. Thus, the Court reports those allegations here, but with the disclaimer that these facts are not yet established and may never be.

[2] Refers to PAGEID #.

James Flynn, who was at that time associated with broker-dealer Voya Financial Advisors located in Greenville, South Carolina. (*Id.*). Jones alleges that in 2016 she approached Flynn with an interest in long-term investments, including variable life insurance policies. (*Id.*). Relying on Flynn's advice, Jones applied for what she believed was a "standard" variable life insurance policy issued by the Defendant, Ohio National Life Insurance Company. (*Id.* at #6). In recommending the policy to Jones, Flynn told her that it was a "solid investment" and that the premiums on the policy were tax deductible. (*Id.*).

According to Jones, however, the policy was not "standard." It was in fact a "key man" policy, a type of insurance typically "purchased by companies to insure the lives of key executives and ensure business continuity in case of their death." (*Id.*). On this type of policy, Jones says, the company for which the executive works generally pays the premiums and stands to benefit if the insured executive dies. (*Id.* at #6–7). Ohio National originally issued the policy to Jones in the amount of approximately $5,000,000, which was increased, on Flynn's advice, to $6,000,000 a few months later. (*Id.* at #6).

Jones alleges that this policy "was entirely unsuited" to her needs as a "middle-aged bookkeeper with a relatively modest income." (*Id.* at #7). Moreover, she alleges that Ohio National should have known its unsuitability because the premiums— approximately $200,000 per year—were paid directly by Jones, but the policy was for the benefit of her husband's company. (*Id.*). Although she asserts that Flynn "falsely inflated [her] income and assets on the application," she says that Ohio National

nonetheless acted unreasonably in failing to investigate the "red flags" in her application. (*Id.*). And Ohio National was not merely ignorant, Jones contends, because Flynn told her he had "spoken to several representatives at Ohio National, and everyone, including the president of the company, [had] made [issuing the policy] a top priority." (*Id.* at #6).

Jones also addresses the alleged relationship between Ohio National and Flynn. Specifically, she alleges Ohio National maintains "Just In Time" appointments, by which independent brokers-dealers may be appointed authorized agents of Ohio National. (*Id.* at #4). On Jones's information and belief, Flynn was acting as an authorized agent of Ohio National when he recommended the insurance product at issue in this suit. (*Id.*).

According to Jones, financial pressure incentivized Flynn to suggest this unsuitable product. Selling Jones this particular policy would have benefited Flynn because "key man" policies are "extremely profitable," generating "substantial premiums" for the issuer and "high commissions" for the selling agent. (*Id.* at #9). And Jones alleges that Flynn was in financial straits when he recommended the key man policy, having filed for bankruptcy in 2013 claiming debts of over $3.5 million. (*Id.* at #5). Before he recommended this policy to Jones in 2016, at least one customer had filed a dispute against Flynn, claiming more than $120,000 in damages for "unauthorized, unsuitable trades" on the customer's account. (*Id.*).

Jones filed her Complaint in the Northern District of Ohio on February 18, 2020, asserting claims of securities fraud, violation of Ohio consumer protection law,

common law negligence, and unjust enrichment. (*Id.* at #9–15). Ohio National filed a motion to dismiss or, in the alternative, to transfer venue to the Southern District of Ohio, on April 2, 2020. (Doc. 9). Jones timely responded in opposition ("Opp'n," Doc. 10) on April 22, 2020, and Ohio National replied in support of its Motion (Doc. 11) on May 5, 2020. Without addressing the merits of the Motion to Dismiss, the then-assigned Judge granted the alternative Motion to Transfer venue on August 19, 2020, thereby transferring the case to this Court. The matter is now before the Court on the Motion to Dismiss (Doc. 9).

## LEGAL STANDARD

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [Jones] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is so, however, only as to factual allegations. The Court need not accept "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

4

Likewise, the Court need not accept as true any legal conclusions alleged in a complaint; "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice. *Id*.

With that in mind, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the potential rigors (and costs) of the discovery process. Discovery, after all, is not meant to allow parties to discover whether a claim in fact exists, but rather to provide a process for gathering evidence to substantiate an already plausibly-stated claim. *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

## LAW AND ANALYIS

### A.   Jones Adequately Alleges That Flynn's Alleged Violation Of Rule 10b-5 May Be Imputed To Ohio National.

Jones's first cause of action asserts Ohio National violated § 10(b) of the Securities and Exchange Act of 1934, and its implementing regulation, Securities and Exchange Commission ("SEC") Rule 10b-5. More specifically, Jones alleges Ohio National violated Rule 10b-5 by failing to undertake a "suitability determination" with respect to her purchase of the "key man" insurance policy. (Compl., Doc. 1, #10).

The Sixth Circuit has recognized (though only infrequently) a securities "suitability" claim as "essentially [a] fraud claim[]."*Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990); *see also Robert N. Clemens Tr. v. Morgan Stanley*

*DW, Inc.*, 485 F.3d 840, 848 (6th Cir. 2007) ("A suitability claim is a type of section 10(b) fraud claim." (citing *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1032 (4th Cir. 1997))). Other circuits have likewise recognized such claims. *See Banca Cremi*, 132 F.3d at 1032 (citing "unsuitability" cases in the Tenth, Sixth, First, and Second Circuits).

Rule 10b-5, which implements § 10(b) of the Securities and Exchange Act of 1934, prohibits three categories of conduct. The rule makes it unlawful for any person:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Jones does not make clear in her Complaint exactly which of these three categories she claims Ohio National violated. That may matter, as the category potentially impacts the relevant analytical framework. For example, the Tenth Circuit has differentiated between "suitability" claims based on misrepresentation or omission (i.e., 10b-5(b)) and those based on other fraudulent conduct (i.e., 10b-5(a) and (c)), the latter of which it treats as analogous to "churning" claims. *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 897–98 (10th Cir. 1992) (observing that "[s]ome courts … have analyzed [unsuitability] simply as a misrepresentation or failure to disclose," and contrasting an unsuitability claim

based on fraud by conduct, which is "a violation of Rule 10b–5(a) and (c) and is analogous to a churning claim").

The Court concludes that 10b-5(b) is the most appropriate vehicle to analyze Jones's claim. *Cf. O'Connor*, 965 F.2d at 897 ("In [a suitability] case, the broker has omitted telling the investor the recommendation is unsuitable for the investor's interests. The court may then use traditional laws concerning omission to examine the claim."). The case at bar presents no similarities to a classic "churning" case, wherein "the broker 'overtrades' a relying customer's account to generate inflated sales commissions." *Craighead*, 899 F.2d at 489 (citing *Armstrong v. McAlpin*, 699 F.2d 79, 90 (2d Cir. 1983)). Moreover, although Jones does not explicitly identify a particular subsection of Rule 10b-5, both parties appear to treat her claim as arising under subsection (b), that is, as a "misrepresentation or omission" claim. (*See* Br. in Supp., Doc. 9-1, #50 ("To state a valid claim under SEC Rule 10b-5, a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact ….'"); Opp'n, Doc. 10, #71 ("Ohio National is liable for Flynn's fraudulent misrepresentations and omissions in relation to issuing Mrs. Jones this wholly unsuitable key man policy.")). Thus, in analyzing the plausibility of Jones's claim, the Court will refer to traditional 10(b) misrepresentation and omission cases.

To prevail on a Section 10(b) "suitability" claim predicated on misrepresentation or omission, a plaintiff must establish five elements: "(1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew

or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to his detriment on the defendant's fraudulent conduct." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, No. CV2011136WOBREW, 2013 WL 11303921, at *1 (E.D. Ky. May 8, 2013) (quoting *Banca Cremi*, 132 F.3d at 1032); *see also Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir. 1993); *Bourbonnais v. Tesch*, No. 14-C-966, 2015 WL 778627, at *3–4 (E.D. Wis. Feb. 24, 2015).

Thus, an unsuitability claim strongly resembles a typical 10(b) fraud claim, but additionally requires "(a) proof of the knowing purchase or recommendation of unsuitable securities, and (b) that the misrepresentations and omissions in question *relate to the suitability* of the securities." *See Robert N. Clemens Tr.*, 485 F.3d at 850 (emphasis added) (quoting *Louros v. Kreicas*, 367 F.Supp.2d 572, 587 (S.D.N.Y. 2005)). Ultimately, "an investment is unsuitable for an investor if what the broker recommends contradicts the investment goals communicated to the broker by the investor." *Id.* at 849 (citing *Brown*, 991 F.2d at 1031).

In addition to pleading the necessary substantive elements, a plaintiff must meet the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA") of 1995 to survive a motion to dismiss a securities fraud claim. Rule 9(b) requires that a plaintiff "state with particularity the

circumstances constituting fraud or mistake." *See also Craighead*, 899 F.2d at 493. And the PSLRA states that, for any materially false statement or omission alleged, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

In seeking dismissal, Ohio National argues Jones has failed to make out a securities fraud claim against the company because liability under Section 10(b) requires a misrepresentation or omission. Jones has failed to allege such a misrepresentation or omission, Ohio National contends, for the simple reason that Jones has failed to allege that Ohio National *itself* made any representations or omissions to Jones at all. (Br. in Supp., Doc. 9-1, #50). Rather, according to Ohio National, the Complaint alleges that it was *Flynn* who recommended and made representations about the Policy. (*Id.*). Nor can Ohio National be directly liable for its own alleged failure to undertake a suitability analysis, it says, as the law places responsibility for any suitability review solely on Flynn and Voya, the third-party broker-dealer that sells the security, not the issuer itself.

Jones offers three responses. First, she argues that Flynn was an "authorized agent" of Ohio National, and therefore that his misdeeds may be attributed to Ohio

9

National as the principal. (Opp'n, Doc. 10, #71). Second, Jones claims that federal securities laws require Ohio National *itself* to engage in a suitability determination, even if Flynn was not its agent. Jones cites *Cooper v. Pacific Life Insurance Co.*, 229 F.R.D. 245 (S.D. Ga. 2005), for the proposition that an insurer's "failure to undertake suitability reviews, or [to] engage in suitability oversight" can constitute a violation of Rule 10b-5. (Compl., Doc. 1, #10). Third, Jones says that an insurer's duty to investigate the suitability of an annuity is embodied in the Ohio Administrative Code. (Opp'n, Doc 10, #76 (citing Ohio Admin. Code § 3901-6-13(F)(3))).

Of those three arguments, the Court starts (and ends) with the agency issue. On that front, Jones's Complaint alleges that Ohio National "maintain[s] a 'Just In Time' appointments procedure that permits independent brokers-dealers to be appointed [Ohio National's] authorized agents," and that "[o]n information and belief, Flynn was … an authorized agent of Defendants, selling their products." (Compl., Doc. 1, #4). For its part, Ohio National seems to concede that it had some kind of agency relationship with Flynn. However, it argues that Flynn was authorized to act only in a "limited role"—as an insurance agent who "cannot by law sell a security." (Reply, Doc. 11, #87–88; *id.* at #90 ("That Flynn also happened to be authorized to act as a limited agent of Ohio National for purposes of selling insurance policies has no bearing on his alleged recommendation of an unsuitable security ….")). It says Jones's claims arise "entirely and exclusively out of Flynn's status as a registered representative associated with the securities broker-dealer Voya Financial," rather than out of any relationship between Flynn and Ohio National. (*Id.* at #88). In other

10

words, Flynn may have been an agent, Ohio National says, but not for the purposes of the misrepresentations or omissions at issue here.

The Court is disinclined to rely on Ohio National's proposed distinction, at least at the motion to dismiss stage. For one thing, a variable life insurance policy is generally recognized as a "hybrid" product—part insurance, part security. *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 105 (2d Cir. 2001) ("Variable annuities are typically characterized as 'hybrid products,' possessing characteristics of both insurance products and investment securities."). Thus, Ohio National's claim that Flynn is an agent only for insurance purposes may not be the cure-all that Ohio National claims. For example, in *Nelson v. Pacific Life Insurance Co.*, a factually similar case involving the sale of variable annuities, the Southern District of Georgia denied an insurer's motion to dismiss, in part because the plaintiff alleged that the insurer-defendant had "a principal-agent relationship with the individual NASD registered representatives that [sold] the company's variable annuities, making [the insurer] primarily liable for the alleged omission of a material fact." CIV.A. CV203-131, 2004 WL 1592617, at *3 (S.D. Ga. July 12, 2004). The court denied the motion to dismiss despite the facts—similar to the facts Ohio National relies on here—that: (1) the defendant was an insurance company; (2) the point-of-sale representatives were associated with independent broker-dealers, *see id.* (alleged agents were "individual NASD registered representatives that sell the company's variable annuities"); and (3) the allegedly unsuitable products were "hybrid," s*ee id.* at *1 ("A variable annuity is an insurance contract that is subject to regulation under state

insurance and [federal] securities laws." (Citation omitted)). In short, whether Flynn was merely selling an "insurance policy" or an "unsuitable security" is not so simple an inquiry as Ohio National suggests, meaning that whether his conduct was outside the scope of agency, even on Ohio National's account of events, may require further factual investigation.

But even more fundamentally, as the discussion in *Nelson* also aptly illustrates, the existence and scope of an agency relationship is generally a question of fact, rather than law, a point equally applicable under whichever State's law (Ohio or South Carolina) applies here.[3] *Fuller v. Anchor Pointe Marina*, 100 N.E.3d 1281, 1287 (Ohio Ct. App. 2017) ("The existence of an agency relationship is a question of fact." (quoting *Dickinson v. Charter Oaks Tree & Landscaping Co.*, No. 02AP-981, 2003 WL 1924638, at *4 (Ohio Ct. App. Apr. 24, 2003))); *Whitt v. Serv. Mut. Ins. Assn.*, No. 1264, 1981 WL 10261, at *3 (Ohio Ct. App. Feb. 26, 1981) ("The scope of Kennedy's agency, as most questions of scope of agency, is a question of fact."); *Holmes v. McKay*, 513 S.E.2d 851, 854 (S.C. Ct. App. 1999) ("Usually, whether an agency relationship exists and the scope of the alleged agent's authority are questions of fact for the jury." (citing *Am. Fed. Bank v. Number One Main Joint Venture*, 467 S.E.2d 439, 442 (S.C. 1996))).

Here, Jones has alleged that Flynn was an appointed agent of Ohio National, and Ohio National has conceded that he was, at least for purposes of selling

---

[3] Jones asserts that "South Carolina law … governs the agency issue because Flynn was a broker in that state." (Opp'n, Doc. 10, #72). Ohio National does not address the choice-of-law question. The Court need not decide precisely which State's law controls at this stage, however, because the result appears the same under either.

insurance. Although agency for the purpose of selling insurance does not automatically establish agency for the purpose of giving investment advice, *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 662 (6th Cir. 2005), the only question at this stage is whether Jones has stated a plausible claim. The Court concludes that she has. Her allegation that Flynn was Ohio National's "agent" for purposes of the advice he gave her suffices, if barely, to set forth a plausible claim. Of course, if it ultimately turns out of as a matter of *undisputed fact* that Flynn's agency relationship with Ohio National did not extend to the representations at issue here, the Court will certainly revisit the scope issue on summary judgment. But that is a question for another day.

Because the Court determines that Jones's claim survives based on her agency allegation, it does not reach her alternative theories of liability—that (1) federal securities laws require Ohio National itself to engage in a suitability determination, and (2) the Ohio Administrative Code creates a duty for an insurer to investigate the suitability of an annuity. That is because "the number of legal theories for holding a defendant liable for securities fraud does not multiply the number of the plaintiff's claims. Therefore, what matters for present purposes is that [Jones] [has] stated claims against [Ohio National] under principles of agency law." *Bourbonnais v. Ameriprise Fin. Servs. Inc.*, No. 14-C-966, 2015 WL 12991000, at *6 (E.D. Wis. Aug. 20, 2015) (internal citation omitted).

Nevertheless, while not strictly necessary, the Court offers a word on whether Ohio National itself is primarily liable for its failure to undertake a suitability review.

The only case Jones cites on that issue is *Cooper*, 229 F.R.D. 245. While that court found that "a variable annuity issuer's failure to undertake suitability reviews, or engage in suitability oversight, *could* constitute securities fraud," it simultaneously recognized that "the responsibility for determining suitability at the point of sale is typically the domain of the broker-dealer." *Id.* at 255–56 (emphasis added).[4]

*Cooper*'s rationale for extending the suitability duty beyond its "typical domain" included that the insurance company was "in a better position to determine suitability" when placing tax-deferred annuities within qualified (tax-deferred) retirement plans, and that plaintiffs had "presented some evidence that [the insurance company] actually increased the difficulty of the suitability determination

---

[4] Other courts have expressed a similar understanding: that the broker primarily shoulders responsibility for determining an investment's suitability. *See, e.g., O'Connor*, 965 F.2d at 897 ("In such a case, *the broker* has omitted telling the investor the recommendation is unsuitable for the investor's interests.") (emphasis added). This includes the Sixth Circuit, which has more than once couched the "suitability" analysis in terms of the "broker." *See Rhinehimer*, 787 F.3d at 806 n.3 ("In essence, unsuitability fraud occurs where *a broker knows or reasonably believes certain securities to be unsuitable* to a client's needs, but recommends them anyway.") (emphasis added); *Robert N. Clemens Tr.*, 485 F.3d at 849–50 (noting that a plaintiff would normally plead an unsuitability claim "by alleging facts regarding his or her investment objectives at the time of investment, that those objectives were communicated to *the broker*, and that *the broker* nonetheless recommended securities that did not further those investment goals") (emphasis added).

Imposing such a duty on the broker seems particularly reasonable given the essence of an unsuitability claim: that the recommended security is *inconsistent* with the plaintiff's investment objectives. In a typical stock-based security transaction, the security's issuer has no reason to know of the plaintiff's investment goals, and therefore placing a suitability duty on the issuer in that case would make little sense. Admittedly, such a consideration might apply with less force to a situation where, as here, the issuer of an insurance policy ultimately must approve the purchaser's application. Jones certainly proceeds under this theory, alleging that the information on her application should have put Ohio National on notice of an unsuitable investment choice. Again, however, the Court need not, and does not, decide whether such an allegation succeeds in stating a claim for securities fraud.

14

by issuing a misleading prospectus." *Id.* at 256. The court concluded by emphasizing the narrowness of its holding, confining it "to the unique facts presented." *Id.*

Moreover, that decision came in the context of a motion for class certification, and after significant discovery had already occurred. Here, on the basis of the Complaint—which fails to allege the sort of unique circumstances in *Cooper*—and limited briefing, the Court is unable to determine the propriety of extending the rationale of *Cooper* to this case, and therefore declines to decide that question.

In sum, the Court **DENIES** Ohio National's Motion to Dismiss (Doc. 9) with respect to Jones's Section 10(b) securities claim.

## B. Jones Fails To State A Claim Against Ohio National Under Ohio's Consumer Sales Practices Act.

Jones's second cause of action alleges that Ohio National violated Ohio's Consumer Sales Practices Act ("CSPA"). The Ohio CSPA prohibits suppliers from engaging in unfair or deceptive acts or practices "in connection with a consumer transaction." Ohio Rev. Code § 1345.02(A). The definition of "consumer transaction," however, excludes "transactions between persons, defined in sections 4905.03 and 5725.01 of the Revised Code, and their customers." *Id.* § 1345.01(A). And "persons" in § 5725.01 includes an "[i]nsurance company," which is in turn defined to include "every corporation, association, and society engaged in the business of insurance of any character, or engaged in the business of entering into contracts substantially amounting to insurance of any character." *Id.* § 5725.01(C). Ohio National argues that Jones's second cause of action fails as a matter of law because the transaction at issue amounts to a transaction between an insurance company and its customer, thus

15

exempting it from the CSPA. (Br. in Supp., Doc. 9-1, #53 (citing *Dillon v. Farmers Ins. of Columbus, Inc.*, 47 N.E.3d 794, 794 (Ohio 2006)).

Jones responds that Ohio National misreads the Ohio Supreme Court's statement in *Dillon v. Farmers Insurance of Columbus, Inc.*, that the CSPA "exempts transactions between insurers and their customers from its definition of consumer transaction." *Dillon*, 47 N.E.3d at 798. According to Jones, that case "applies narrowly to instances where an insurer fails to notify its insured that it has repaired an automobile using non-OEM compliant parts." (Opp'n, Doc. 10, #77–78). Jones is correct that the court in *Dillon* was focused on the obligations imposed on "insurers who provide their customers with automobile-repair estimates." *See Dillon*, 47 N.E.3d at 798 (citing Ohio Rev. Code § 1345.81). But Ohio National need place no reliance in that case—the plain language of §§ 1345.01(A) and 5725.01 of the Ohio Revised Code forecloses Jones's claim in this respect. And, in any case, Ohio National cited the case only for the Ohio Supreme Court's explanation of the insurance exemption. *See Dillon*, 47 N.E.3d at 798 (citing Ohio Rev. Code § 1345.01(A)).

In light of the statute's plain language, the Court concludes that it is Jones who overreads *Dillon*. Jones emphasizes that, according to *Dillon*, a "consumer may … seek a declaratory judgment, an injunction, or other appropriate relief against an act or practice that violates [Chapter 1345 of the Ohio Revised Code]." (*See* Opp'n, Doc. 10, #78) (quotation marks omitted). Based on that, she argues that she should be allowed to re-plead her CSPA claim to seek these other forms of remedy. (*Id.*). To be sure, § 1345.09 provides for declaratory, injunctive, or other appropriate relief

16

"against an act or practice that violates" Chapter 1345. But the Ohio Supreme Court made that statement specifically in the context of Revised Code § 1345.81, which "imposes obligations on insurers who provide their customers with automobile-repair estimates that are based on the use of non-OEM parts." *Dillon*, 47 N.E.3d at 798. In that statement, the court was merely explaining that an insurer may violate 1345.81(B)(1) by failing to notify a customer that their automobile has been repaired using non-manufacturer parts. But such a violation does not constitute an "unfair and deceptive act or practice" (and therefore does not qualify under the remedial provision § 1345.81(E)). None of this discussion provides any help to Jones, however, because she has not pointed to any way in which Ohio National allegedly violated Chapter 1345. The only provisions Jones cites are §§ 1345.02 and 1345.03, but Ohio National cannot run afoul of those because, as detailed above, it was acting purely as an insurer, and therefore its acts were not "in connection with a consumer transaction."

Alternatively, Jones says Ohio National violated the OCSPA because it violated Ohio Administrative Code § 3901-6-13(4)(b).[5] (Compl., Doc. 1, #12 (citing *Frey v. Vin Devers, Inc.*, 608 N.E.2d 796, 799–800 (Ohio Ct. App. 1992)). This argument fails for two reasons. First, as above, the sale of an insurance policy is not a "consumer transaction." Second, there is an important difference between the Ohio Administrative Code section at issue in *Frey*—the case on which Jones relies—and

---

[5] The Court notes that the specific Ohio Administrative Code section cited in the Complaint (§ 3901-6-13(4)(b)) does not appear to exist; however, the Court's conclusion applies regardless of which section of Rule 3901-6-13 Jones relies on.

17

the OAC provision here. In particular, the Attorney General promulgated the OAC provision in *Frey* specifically to further "define … any act or practice that violates R.C. 1345.02(A)." 608 N.E.2d at 799. Here, by contrast, the OAC section Jones cites resides in a separate Chapter, one that vests enforcement authority "exclusively in the superintendent of insurance." Ohio Admin. Code § 3901-6-13(H)(3). That precludes Jones from seeking to rely on this OAC provision as support for her CSPA claim. The Court thus **DISMISSES** that claim **WITH PREJUDICE**.

## C. Jones Fails To State A Claim For Negligence Against Ohio National Under Ohio Law.

Jones's third cause of action alleges Ohio National's negligence under Ohio common law. (Compl., Doc. 1, #13–15). In order to recover on a negligence claim, a plaintiff must prove "(1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach." *Beckemeyer v. Gelco Corp.*, 828 F. App'x 251, 253 (6th Cir. 2020) (quoting *Wallace v. Ohio Dep't of Com.*, 773 N.E.2d 1018, 1025–26 (Ohio 2002)). In negligence, the concept of "duty," though sometimes "elusive," "refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Wallace*, 773 N.E.2d at 1026. The existence of a duty generally depends upon the foreseeability of harm: "if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Id.* (citing, e.g., *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* 693 N.E.2d 271 (Ohio 1998)).

Ohio National argues Jones's negligence claim must be dismissed because she has failed to allege any duty Ohio National owed to her and because her damages are purely economic and therefore barred by Ohio's economic loss rule. (Br. in Supp., Doc. 9-1, #55–56). These contentions are interrelated, in that they both relate to the source of Ohio National's alleged duty.

Start with the economic loss rule. Ohio National quotes the Ohio Supreme Court: "[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." (*Id.* at #55 (quoting *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005))). Absent a contractual relationship, then, there is generally "no … duty to exercise reasonable care to avoid intangible economic … losses to others." *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 560 N.E.2d 206, 208 (Ohio 1990). "The primary purpose of the economic-loss doctrine," though, "is to 'maintain the line of demarcation between tort law and contract law' in situations in which both tort and contract theories could apply." *Motorists Mut. Ins. Co. v. Ironics, Inc.*, __ N.E.3d __, 2022 WL 852346, *7 (Ohio Mar. 23, 2022) (quoting *Lesiak v. Cent. Valley Ag Coop., Inc.*, 808 N.W.2d 67, 82 (Neb. 2012)). "The economic-loss doctrine therefore prevents the tortification of contract law." *Id.* (quotation omitted).

Consistent with that latter understanding, "where a plaintiff has suffered only economic harm as a result of a defendant's breach of duty, the economic-loss rule will bar the tort claim *if the duty arose only by contract*." *Mulch Mfg., Inc. v. Advanced*

*Polymer Sols., LLC*, 947 F.Supp.2d 841, 856 (S.D. Ohio 2013) (emphasis added) (quoting *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011)). But a corollary must also then be true: the rule is inapplicable, and a plaintiff suffering only economic damages may proceed in tort, if the defendant breached a duty that does *not* arise solely from a contract. *Id.*; *see also Corporex*, 835 N.E.2d at 705; *accord Campbell*, 961 N.E.2d at 205 (in determining whether the economic-loss rule applies to tort claims, courts must examine whether the defendant owes any duties to the plaintiff "that [are] imposed by law instead of by contract"). In other words, "where a tort claim alleges a duty was breached *independent* of the contract, the economic loss rule does not apply." *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 171 N.E.3d 851, 861 (Ohio Ct. App. 2021) (emphasis added); *see also Windsor Med. Ctr., Inc. v. Time Warner Cable, Inc.*, 167 N.E.3d 23, 29 (Ohio Ct. App. 2021) (same).

A duty is independent of a contract if the defendant would owe that duty "even if no contract existed." *425 Beecher, LLC v. Unizan Bank, Nat'l Ass'n*, 927 N.E.2d 46, 59 (Ohio Ct. App. 2010) (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996)). One such "preexisting" tort duty that may support recovery of purely economic damages, for example, is the "duty not to negligently supply false information to those relying upon it"—that is, the duty underlying the tort of negligent misrepresentation. *Sona Techs., LLC v. Barber*, No. 2:08-CV-468, 2010 WL 11537997, at \*5 (S.D. Ohio Mar. 12, 2010) (citing *425 Beecher*, 927 N.E.2d at 58–60); *see also Corporex*, 835 N.E.2d at 705 ("Liability in *Haddon View* was based exclusively upon this discrete, preexisting duty in tort and not upon any

terms of a contract or rights accompanying privity. … DSI fails to identify any duty in tort analogous to the duty identified in *Haddon View*.")).

At bottom, for Jones to proceed with her negligence claim, she must point to "some positive legal duty imposed by law because of the relationship of the parties," duties that have nothing to do with the insurance policy. *Solid Gold Jewelers v. ADT Sec. Sys., Inc.*, 600 F.Supp.2d 956, 960 (N.D. Ohio 2007). She says she can. (Opp'n, Doc. 10, #81 (quoting *Campbell*, 961 N.E.2d at 211)). Specifically, Jones points to two potential candidates. First, Jones argues that OAC § 3901-6-13(F)(1) requires Flynn to recommend only suitable insurance products, and that his breach of that duty is imputed to Ohio National as Flynn's principal. (*Id.* at #79). Second, Jones says Ohio National, as the insurer, directly owed her a duty under another provision of the same section, § 3901-6-13(F)(3), which, according to Jones, requires that "an insurer shall not issue an annuity recommended to a consumer unless there is a reasonable basis to believe the annuity is suitable based on the consumer's suitability information." (*Id.*). The Court takes them in that order.

There is an insurmountable problem with Jones's reliance on the first of those two provisions. Another section of the same rule, § 3901-6-13(C)(2), unequivocally states that:

> Nothing herein shall be construed to create or imply a private cause of action for a violation of this rule *or to subject an insurance agent to civil liability* under the best interest standard of care outlined in this rule or under standards governing the conduct of a fiduciary or a fiduciary relationship.

§ 3901-6-13(C)(2) (emphasis added). That forbidden maneuver (i.e., subjecting an insurance agent to civil liability) is precisely what Jones seeks to do here—she seeks

to subject Ohio National to civil liability (on an agency theory) for Flynn's breach of the duty the rule imposes. As Section (C)(2) precludes direct liability for Flynn, though, Ohio National cannot be subject to derivative liability under that theory.

As for the second, Jones's attempt to attack Ohio National itself under § 3901-6-13(F)(3) fares little better. Consistent with the Chapter's specific disclaimer of any private right of action, Section 3901-6-13(H) expressly provides that, "[i]f a violation [of the rule] occurs, … the *superintendent* may order" certain remedies, including "[a]ppropriate penalties and sanctions." (Emphasis added). And it further declares that "authority to enforce compliance with this rule is vested *exclusively in the superintendent of insurance*." (Emphasis added).

As the court in *Strack v. Westfield Companies*, 515 N.E.2d 1005 (Ohio Ct. App. 1986), observed, inferring a private cause of action from a provision of the Ohio Administrative Code that is silent on the matter "would be inconsistent with the existing administrative enforcement scheme" and would "not necessarily further the policy behind" the code. *Id.* at 1008; *see also* Ohio Admin. Code § 3901-6-13(C)(2) ("Nothing herein shall be construed to create or imply a private cause of action … or to subject an insurance agent to civil liability …."). But the same inconsistency that the Oho court disclaimed in *Strack* would arise if a plaintiff could accomplish an identical end through the mere artifice of (1) citing the Administrative Code provision to create a duty, and then (2) using a negligence theory to sue on that duty. In short, Jones cannot rely on those two code provisions as the basis for a negligence claim, and she has failed to articulate or cite authority for any other common law duty.

22

Alternatively, Jones argues that, even if the Administrative Code does not supply the necessary tort duty with respect to the policy's suitability, the Court should permit her to re-plead her Complaint because "the facts … would support a claim for negligent hiring and supervision of Flynn by the principal, Ohio National." (Opp'n, Doc. 10, #80). As the Sixth Circuit has observed, though, "[a] request for leave to amend[, presented] almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is … not a motion to amend." *La. Sch. Emps. Ret. Sys. V. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010) (internal quotation marks omitted). Jones is not "entitled to an advisory opinion from the Court informing [her] of the deficiencies of the claim and then an opportunity to cure those deficiencies." *Id.* (quoting *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2010)) (emphasis omitted).

If Jones believes that she can set forth a claim for negligent supervision, she should seek leave to do so. The Court notes, however, that, as one element of any such claim, "a plaintiff must demonstrate that the employer knew or should have known of the employee's … tortious propensities." *Collins v. Flowers*, No. 04CA008594, 2005 WL 1763615, at *6 (Ohio Ct. App. July 27, 2005) (citation omitted). The employer's ability to foresee the employee's allegedly tortious conduct is determined by considering the totality of the circumstances, and "it is only when the totality of the circumstances are 'somewhat overwhelming' that the [employer] will be held liable." *Staten v. Ohio Exterminating Co., Inc.*, 704 N.E.2d 621, 624 (Ohio Ct. App. 1997)

(citing *Evans v. Ohio State Univ.*, 680 N.E.2d 161, 173 (Ohio Ct. App. 1996)). That is a demanding standard.

In sum, Jones has failed to identify an appropriate legal duty on which to base her negligence claim. Given Jones's invocation of a potential negligent supervision theory, though, the Court **DISMISSES** her negligence claim as pled, but **WITHOUT PREJUDICE**.

### D.    Jones Plausibly Alleges A Claim For Unjust Enrichment Against Ohio National.

Jones's fourth and final cause of action alleges unjust enrichment under Ohio common law. (Compl., Doc. 1, #15). To state a claim for unjust enrichment in Ohio, Jones must plausibly allege that (1) she conferred a benefit on Ohio National; (2) Ohio National had knowledge of the benefit; and (3) the Ohio National retained the benefit under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984). Recovery under unjust enrichment is designed to compensate the plaintiff for the benefit he or she has conferred upon another, not to compensate the plaintiff for a loss suffered. *Hughes v. Oberholtzer*, 123 N.E.2d 393, 397 (Ohio 1954).

The Court understands Jones to allege that her payment of premiums under the key man policy constitutes a "benefit" conferred by her on Ohio National. And one may assume that Ohio National "had knowledge" that it was receiving those premiums. The trouble with that theory, though, is that a contract indisputably governs the payment of premiums, and an unjust enrichment claim will not lie when it "arises directly from the parties' agreements." *Jones v. Petland, Inc.*, No. 2:08-CV-

24

1128, 2010 WL 536894, at *6 (S.D. Ohio Feb. 11, 2010); *see also Wuliger v. Mfrs Life Ins. Co.*, 567 F.3d 787, 799–800 (6th Cir. 2009) ("[T]he payment of premiums to [defendant] was not a 'benefit' conferred on [defendant], but was consideration for [defendant's] commitment to insuring the viators' lives. Accordingly, … an unjust enrichment claim … would be without merit.").

That said, alternative pleading is permissible under federal law, meaning that a party may plead both a breach of contract claim and an unjust enrichment claim, in the alternative, without negating the validity of either, at least so long as the existence of a contract claim is in dispute. *Ortega v. Wells Fargo Bank, N.A.*, No. 3:11CV01734, 2012 WL 275055, at *11 (N.D. Ohio Jan. 31, 2012); *see also* Fed. R. Civ. P. 8(d). And a claim for unjust enrichment may be maintained *despite* the existence of an express contract where there is evidence of fraud, bad faith, or illegality. *Res. Title Agency, Inc. v. Morreale Real Est. Servs., Inc.*, 314 F. Supp. 2d 763, 772 (N.D. Ohio 2004).

Here, because the Court allows Jones's securities fraud claim to proceed, the existence of a contract is at least arguably in dispute, insofar as rescission is a viable measure of damages under the securities laws. *See Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 550 (6th Cir. 2012) (recognizing that, at least in some circumstances, rescission is an appropriate measure of damages for a § 10(b) claim (citing *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993))).

As such, at least for the time being, Jones may maintain her unjust enrichment claim notwithstanding the apparent existence of an insurance contract covering the

"benefit" she allegedly conferred on Ohio National (i.e., her insurance premiums). That said, the Court also notes that Jones cannot receive double recovery. If she prevails on her securities fraud claim, her relief likely would lie under that claim, rather than under unjust enrichment. Conversely, should it become clear that her fraud claim fails—meaning that the insurance contract is valid—her unjust enrichment claim likely will fail, as well, at least in the absence of any other bad faith or inequitable conduct. *See Res. Title Agency, Inc.*, 314 F. Supp. 2d at 772; *Sindell v. Fifth Third Bank*, No. 1:18 CV 479, 2019 WL 3318571, at *8 (N.D. Ohio Jan. 24, 2019) ("Ohio law permits a plaintiff to recover under the theory of unjust enrichment only when an express contract does not cover the same subject ...."). Either way, it is difficult to imagine how she would recover on an unjust enrichment theory here (as in the former case, it would constitute double recovery, and in the latter case, the claim would fail). Nonetheless, the Court will allow the claim to go forward as an alternative pleading, at least for now.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Ohio National's Motion to Dismiss (Doc. 9) Jones's Complaint (Doc. 1). In particular, the Court **GRANTS** Ohio National's Motion (Doc. 9) with respect to Counts II and III of Jones's Complaint (Doc. 1) and accordingly **DISMISSES** Count II **WITH PREJUDICE** and Count III **WITHOUT PREJUDICE**. The Court **DENIES** Ohio National's Motion (Doc. 9) in all other respects.

**SO ORDERED.**

April 15, 2022
_____
**DATE**

_____
**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**